# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   '23 MJ0359
)
Purple Apple iPhone 14 Pro Max )
Seized as FP&F No. 2023565400005802 Item 0001 )
("Target Device 1") )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Giancarlo Lugo, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Giancarlo Lugo, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 02/02/2023

*Judge's signature*

City and state: San Diego, California      HON. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

Purple iPhone 14 Pro Max
Seized as FP&F No. 2023565400005802 Item 0001
(**"Target Device 1"**)

Target Device 1 is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1, A-2, and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **January 1, 2023, through February 1, 2023**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Giancarlo Lugo, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> Purple iPhone 14 Pro Max
> Seized as FP&F No. 2023565400005802 Item 0001
> **("Target Device 1")**
>
> Red Apple iPhone 8
> Seized as FP&F No. 2023565400005802 Item 0002
> **("Target Device 2")**
>
> Black Apple iPhone SE
> Seized as FP&F No. 2023565400005801 Item 0002
> **("Target Device 3")**

(**"Target Devices"**), as further described in Attachments A-1, A-2, and A-3 to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Lucerito RODRIGUEZ-Diaz for harboring illegal aliens, and Gonzalo DELIRA for transporting and moving illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law

1

enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for fourteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to

3

months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

4

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On January 30, 2023, at approximately 8:00 PM, Border Patrol Agents responded to a mass incursion of a large group of approximately 20 to 30 individuals at the Otay Mesa, California Port of Entry. Due to the weather conditions, only a few individuals were apprehended. On January 31, 2023, Border Patrol Agent-Intelligence S. Zapataroldan, M. Guerrero and Border Patrol Agent E. Hunt were performing their assigned duties in the Chula Vista Border Patrol Station's area of responsibility. Agents were dressed in plain clothes with agency badge visibly on their person. Agents were attempting to locate the individuals that were able to get away the day before by conducting surveillance on a residence believed to be associated to a known smuggler. Agent Zapataroldan was conducting surveillance at a house suspected of harboring illegal aliens located on the 500 block of S. Evans Street, in San Diego, California. At approximately 9:30 AM, Agent Zapataroldan observed a white Toyota Corolla arrive at the house and observed the driver later identified as defendant Gonzalo DELIRA enter the house.

12. At approximately 9:58 AM, Agent Zapataroldan observed DELIRA, and three individuals exit the house and walk towards the Corolla and another vehicle. DELIRA signaled two males to enter the Corolla and he sat in the driver's seat. The fourth individual later identified as defendant Lucerito RODRIGUEZ-Diaz stood next to another vehicle at

the house. Agents approached the house and Corolla and detained all four individuals. Agent Guerrero approached the two passengers and conducted an immigration inspection. Both individuals to include one later identified as material witness Asahel CONTRERRAS-Lopez stated that they are citizens of Mexico without immigration documents allowing them to enter or remain in the United States legally. At approximately 9:59 AM, Agent Guerrero placed both individuals to include CONTRERRAS under arrest. At approximately 10:00 AM, Agent Zapataroldan placed DELIRA under arrest. Agent Hunt approached RODRIGUEZ and identified himself as a Border Patrol Agent and placed her under arrest at approximately 10:00 AM.

13. At approximately 10:05 AM, Agent Zapataroldan requested and was granted consent by RODRIGUEZ to enter her house and search for more undocumented individuals. Agent Hunt encountered two individuals inside the house, and both were escorted outside. Agent Guerrero conducted an immigration inspection on both individuals later identified as material witnesses Pastor Felix CONTRERAS-Cruz and Omar HERNANDEZ-Hernandez. CONTRERAS and HERNANDEZ stated that they are citizens of Mexico without immigration documents allowing them to enter or remain in the United States legally. At approximately 10:10 AM, Agent Guerrero placed CONTRERAS and HERNANDEZ under arrest.

14. At the time of arrest, a purple Apple iPhone 14 **(Target Device 1)**, was found on the passenger seat of her vehicle, a red Apple iPhone 8 **(Target Device 2)** was found in RODRIGUEZ' purse. Both phones were claimed by RODRIGUEZ as her property. A black Apple iPhone SE **(Target Device 3)** was found in DELIRA's hand.

15. The Defendant, Lucerito RODRIGUEZ-Diaz, was read her Miranda Rights, stated she understood her rights, and decided to speak without having an attorney present. RODRIGUEZ stated that she was arrested today by Border Patrol agents for having four individuals, illegally present in the United States, in her house. When initially questioned, RODRIGUEZ stated that these individuals were her friends however, when pressed on the

subject matter, it was evident she did not know their names. RODRIGUEZ admitted that she only knew two of the individuals by their monikers. Further, she admitted that she did not know who the two other individuals were. When questioned further, RODRIGUEZ stated that in the past, two individuals, had broke into her home, threatened her and her son and informed her that they would be using her house for this particular type of work. When questioned regarding these two individuals, RODRIGUEZ stated that they were brothers and provided their respective monikers. When questioned further regarding the two brothers, RODRIGUEZ stated that her sister knew how to get a hold of them.

16. All three material witnesses, Pastor Felix CONTRERAS-Cruz, Asahel CONTRERAS-Lopez, and Omar HERNANDEZ-Hernandez stated that they are citizens of Mexico without any immigration documents that would allow them to enter or remain in the United States legally. All three stated that they made, or someone made for them smuggling arrangements, and that they were going to pay either $8,000 or $10,000 U.S. Dollars. All three stated that they illegally entered the United States by jumping one or two international border fences or by running through an open gate. All three stated that they were part of a much bigger group when they initially entered. CONTRERAS-Cruz stated that he was part of group of twelve individuals that were told by the smugglers to run north through an open gate used for vehicles. CONTRERAS-Lopez stated that he crossed north with fifteen other individuals by jumping over two border fences. HERNANDEZ stated that he was part of group with forty individuals that jumped over only one border fence. Both CONTRERAS-Cruz and HERNANDEZ stated that they knew they were making an illegal entry. Once north of the International Border fence all three stated that they ran a short distance to where they found vehicles waiting for them to get into. CONTRERAS-Cruz stated that someone in his group told them in which vehicle to get into, which he thought was a white tuck. CONTRERAS-Cruz added that only three individuals boarded that vehicle. CONTRERAS-Lopez stated that he ran towards a

maroon or brown vehicle and jumped in. HERNANDEZ stated that he entered a gray pickup truck, and that he was the only one that entered that vehicle.

17. All three stated that they were then taken to the house in which they were apprehend in this event. CONTRERAS-Cruz stated that it only took the driver of his vehicle only approximately twenty minutes to arrive at the house. HERNANDEZ stated that it took his driver approximately an hour to arrive at the house. CONTRERAS-Lopez stated that his driver drove approximately forty minutes and then parked at a shopping center, waited there for another forty minutes, and then drover again for thirty minutes to the house. Both HERNANDEZ and CONTRERAS-Cruz stated that the driver told them to lay down. HERNANDEZ stated that the driver of his vehicle was a male in his 30's wearing a ballcap. Both CONTRERAS-Cruz and CONTRERAS-Lopez stated that once they arrived at the house, they were told by the driver of the vehicle to just enter the house, they both added that the door to the house was already open, so they just went inside. HERNANDEZ stated that when he entered the house, he was the only person there, while CONTRERAS-Lopez stated that there was a male in his mid 30's dressed in all black. CONTRERAS-Cruz stated that there was only a boy in the house by himself, but shortly after a female arrived. CONTRERAS-Lopez stated that when he arrived, he saw that there were already three other individuals there waiting. When shown a photographic lineup, CONTRERAS-Cruz was able to identify the female in the house, defendant Lucerito RODRIGUEZ-Diaz.

18. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that defendants Lucerito RODRIGUEZ-Diaz, and Gonzalo DELIRA were using the **Target Devices** to

communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendants, RODRIGUEZ-Diaz, and DELIRA to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **January 1, 2023, through February 1, 2023**.

## METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

9

results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days from the date this warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

22. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

23. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

24. Because the **Target Devices** were seized at the time of RODRIGUEZ-Diaz, and DELIRA's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on **Target Devices**. As stated above, I

believe that the appropriate date range for this search is from **January 1, 2023, through February 1, 2023.**

25. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachments A-1, A-2, A-3, and seized the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Giancarlo Lugo
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ___2nd___ day of February 2023.

Hon. Karen S. Crawford
United States Magistrate Judge

11